Thank you, Your Honors. May it please the Court, Glenn Bowman, law firm of Katzen Korn, Indianapolis, counsel for the minor children of Adele and Jason Wood, appellants herein. Sorry, Mr. Bowman, I called you Mr. State. That's all right, I've been called worse. We contend the district court erred when it granted defendants jobber motions excluding key experts for the Woods children and based upon that exclusion then granted summary judgment. District Court erred in these opinions in three ways. It abused its discretion by finding the analytical gap too wide between the vinyl chloride exposure levels based on published literature and the vinyl chloride exposure levels that were confirmed. The court erred as a matter of law by excluding the opinions of two medical doctors who developed a differential diagnosis that ruled out all other potential causes and by doing so imposed upon us a standard in which they really were asking us to find a published opinion or study in which we could find exposure at that level to children which we do not believe is what Dawbert requires. I will very quickly cover some important facts relative to the case. They're minor children, they're adopted, they're not biologically related. C.W. was brought into the home in 11 weeks. E.W. was brought into the home in 11 days. They both left the home in November 2008 when the contamination was discovered. We know and it's undisputed the vinyl chloride is a human carcinogen. The United States Agency for Toxic Substance Disease Registry characterizes fetus, infants, and young children as highly susceptible population to vinyl chloride exposure and we know that the ingestion of vinyl There's voluminous documents in the record about the medical. I'll just simply say that the medical records show, as Dr. Powder said, a series of gastrointestinal disturbances. For the 11 day old E.W. she was in Riley with specific problems that could not be identified and she had bloody stools and those kinds of symptoms. So the unfortunate fact is that these children were exposed to vinyl chloride and taking the facts most the plaintiff, Dextran, was the cause. To learn and understand the nature of these problems they went to Jill Powder, a board-certified toxicologist with 24 years of experience, then Dahlgren and Byers and I'll address those. So let's start with Powder and a lot of the briefs address this. Candidly, we address the differential diagnosis but I'm going to discuss the abuse of discretion first because, candidly, we felt we all do respect the district court. The district court was taking the scientific literature and really weighing the evidence. Jill Powder, Dr. Powder, did not ignore dose. She was retained to specifically calculate dose. She did that by, she assumed 8.4 milligrams per liter of vinyl chloride in the drinking water that was based upon a calculation by the Indiana Department of Environmental Management, their calculation. She then used a conservative two liters per day consumption based upon ingestion and inhalation and she got exposures of .003 milligrams per kilogram. So you do a consumption, this is what they drank, this is their size, it's a question of who they are. So you get a .003 milligrams per kilogram exposure for EW and .002 milligrams per kilogram for CW. So to be clear, Powder did not ignore dose. She was employed to actually calculate that and she followed a scientifically reliable methodology as a board-certified toxicologist reaching those conclusions. Right, I think what the district court said was that the dosage, or stated differently, the degree of exposure and duration of exposure that was the subject of the studies wasn't even close to... I'm right there. Okay. The primary study is Maltoni and it does have actual vinyl chloride testing with lab rats and it's relied upon by Powder, it's relied upon by Dahlgren, and what Powder finds, and I agree with her, is that the control is just olive oil. The first level that you get to is .03 and she finds and opines that at .03 there's a correlation between exposure and tumors and the study confirms that. Now in any statistical analysis there's always some points above and some points below, but it does not misrepresent the study to say that when lab rats were exposed to .03, there was a higher incidence of tumors. If you look at the conclusions, and the conclusions in this are worth your time to read, the court says newborn animals, I'm sorry, Maltoni says newborn animals appear to be extremely responsive and easily develop liver tumors. With the above criteria for identifying vinyl chloride dependent tumors, vinyl chloride shows carcinogenic effects even at low doses. Our literature doesn't establish a floor. We do know that at .03 there is a correlation. No, I don't have a study at .003, but when you say well that's ten times higher Mr. Bowman, if you look at the study, if you look at Maltoni, the next step they took was .3. The next step they took above that was 1.7, so they did calculations in which they were exposing lab rats to 30 times, the level that did show some correlation. Yes, you can find a point on the correlation line and say look Mr. Bowman, those particular set of lab rats at .03 didn't have anything further, but there is a correlation, and what I think the District Court and Council for Textron is doing is weighing the evidence. Let us take that to the jury and determine whether .03 or .003 really matters, and the other part of this that candidly I don't get is we completely jumped over the differential diagnosis. These children are sick. The parents are spending lots of time trying to figure it out. Treating physicians are trying to figure it out. They don't know there's the exposure. EW goes to Riley and they figure it out, so you know you have this impact. The symptoms are there, and the District Court never even looked at that. Well, the court said that differential diagnosis is relevant to specific causation, not general causation, and you've got to get by the general hurdle before you can. I think this court in Myers, case of Myers, and we cited it, says that a differential diagnosis, I don't want to get that quote, a differential diagnosis. We cited the Turner case, which is a circuit, that says a properly qualified medical expert performs a reliable differential diagnosis through which, to a reasonable degree of medical certainty, all other possible causes of the victim's condition can be eliminated, leaving only the toxic substance of the cause. A causation opinion based on that differential diagnosis should be admitted, and then I know in the Myers decision, which we cite in a brief, there's reference to the fact that this circuit has acknowledged differential diagnosis as being admissible, but part of that, whether it's general, I believe a differential diagnosis, and I think the law supports this in this circuit and certainly with the Turner decision, that the differential diagnosis can be used for the general, but I think we also met the general. Maltoni is a good study. I mean, thank God we don't have situations where there's a study out there where levels of vinyl chloride at certain high levels go through kids, but we find something where they send it through lab rats. We know at 0.03 there's a correlation. I think we have enough. I think what the district court is asking is a standard too high for us to meet when the impacts in their scientific literature to support that at these levels, ten times higher. I mean, I acknowledge that. We don't have a study at 0.03. But I think what the district court was asking for was these three experts that were excluded, for them to connect the dots for him and say, yes, they're ten times higher. However, this is how I'm getting from my opinion that at levels ten times higher, I see this correlation, and that the district court found that those, that opinion was just conclusory and that there was no connecting of the dots. So not... The scientific literature has yet to find the floor, and the other part of that that doesn't make sense to me then is you have the impact shown. You have the differential diagnosis. You know the children were impacted. It's almost like an inconvenient fact. Oh, thank you. I'll wait. Thank you, counsel. Mr. Chambers? Your Honors, Michael Chambers on behalf of the Appellee Textron. The issue before the court is whether the district court abused its discretion in excluding the causation experts. In deciding whether the court abused its discretion here, the standard of review is highly deferential, and we submit that the plaintiffs have failed to demonstrate an abuse of discretion in meeting the standard for three reasons. One, they've not demonstrated error in the district court's careful review of the scientific studies on which the plaintiff's experts relied. The court determined that each study involved either animals or industrial workers with doses hundreds to thousands of times greater than the duration involving many years, as opposed to the shorter durations here of only seven months and 18 months for the two different children. Next, the district court did not abuse its discretion in concluding that the plaintiff's experts had not reliably extrapolated from these high-dose, long-duration studies to the low-dose, short-duration exposure we see here. They applied what we would say is qualitative guesswork in attempting to extrapolate from these significantly different exposures here, as opposed to a quantitative analysis that was available to them. What was available to them? Well, for one, Your Honor, when you have these high-dose studies and you're trying to compare it to a low-dose, there's different kind of quantitative analyses you can do, such as modeling. For example, there is a model that has been used by, developed by toxicologists, and it's a pharmacokinetic model, or PBPK model. And what you can do with these models is you can plug in the evidence available from an animal, say, for example, and come up with a human equivalent dose. You can plug in a certain route of exposure and see how that comes out in a different route of exposure. So what you can do is you can extrapolate in a quantitative method from these high-dose animal studies to a quantitative analysis. They've done it with respect to bionic chloride itself. They took one of these animal studies and took those doses, they plugged it into the PBPK model, and they came up with a human equivalent dose. We've discussed some of these thresholds that they developed based on this modeling and this quantitative analysis. These are shown in our brief at pages 6 and 7. And what they did is they come up with these thresholds called the low-L and no-L. These are effects at which a low-L is the lowest level at which you've seen an observed effect, and the no-L is where you see no observed adverse effect level. What's important is the no-L, where you have no observed adverse effect level, is at 0.09 milligrams per kilogram per day. And that is a dose where there's no effects over the course of a lifetime. What you recognize here is that that's the children's dose, which Mr. Bowman walked through and calculated. That dose is 30 times below the no-L, and they had short-term exposure as opposed to lifetime exposure assumed for these thresholds. Another quantitative analysis you can do is you can, there is the ability to calculate the effects of early life exposure. The court actually, in its opinion, talked about one of these cases, Baker v. Chevron, where an expert calculated adjusted exposure levels for benzene for early life exposures based on EPA guidance. And they didn't do that here either. What I want to discuss now, which Mr. Bowman discussed in his argument, was the Maltoni study. And that's the only study that the plaintiffs discussed in the appeal. It's the one they kind of hang their hat on as the one that's applicable. But we submit that it's not even close. First of all, this involved 20 experiments on rats and hamsters to assess whether there was any correlation between vinyl chloride and cancer. There are multiple problems with their reliance on this Maltoni study. And to quote the trial court here, they said its reliance on this study showed that the expert's opinions rested on very flimsy scientific ground. Now, first, the conclusion that they've told you that the study reached is not with an exposure at .03 milligrams per kilogram per day, which they say is only 10 times higher than the plaintiff's dose here. But the Maltoni study explicitly states that no increase in vinyl chloride correlated tumors was found at this dose. That's language we cite in our brief at page 17. We've pointed out the same argument, flaw in their argument below. The trial court specifically noted that the study did not reach this conclusion. But here we are again, hearing the same argument. So the effect was at effectively 100 times the children's exposure, rather than 10 times? Actually, this study concluded that the lowest dose by ingestion, at which a statistically significant correlation would be found, is 16.65 milligrams per kilogram per day, which is over 5,000 times the plaintiff's dose here. So it's well, well greater. The next point, why it's not applicable, is that the dose here, again, is much longer. When you have to, when you're talking about rats, what you have to do is correlate that to human exposure, because their lifespan is so much shorter. Here, this particular experiment we're looking at, it's one experiment that they focus on from the Maltoni study. It's called BT27. Actually, it lasted decades. We showed the calculation in our brief, and it was approximately 25 years. Again, we're talking about 18 months, seven months exposure, at much, much lower levels than we see in these studies. The next problem with the Maltoni study is that the study itself showed that it had no direct application to humans at this point. It said it was only setting the stage for possible future extrapolation. Now, you could try to extrapolate it now. That's not what the plaintiffs did. They didn't perform in these analyses. The last point is that even if they somehow applied it here, it addresses only possible cancer effects. It has nothing to say about non- this extrapolation point. What the plaintiffs did is they basically did qualitative guesswork. What they said was, well, we can apply these studies because children are more susceptible. We can apply these studies because a chemical is absorbed in the body more readily from ingestion than inhalation. They didn't say how much. They didn't say what's the difference in the susceptibility of what we have is this qualitative say-so. That's not a reliable methodology under Dawbert and Rule 702. It's only speculation and guesswork. So what the trial court was left here was an analytical chasm between the levels in these studies and the plaintiffs' exposure. Now we heard counsel say that, you know, the district court was weighing the evidence. They weren't weighing- the district court wasn't weighing the evidence. It was looking at these doing its Dawbert analysis to determine whether there was a reliable methodology, reliable facts, to actually find for general causation. Were there experts presenting these studies or were they just presented to the court? Were there experts testifying as to the- At the hearing, no. They were actually submitted in the briefing a variety of studies and then their arguments made with respect to the applicability of studies in the briefing. So the trial court was left with this enormous gap. We call it an analytical chasm between these studies and the exposures we have here. I'd like to also address the differential diagnosis point. The plaintiffs say that the trial court committed error because it didn't address the differential diagnoses conducted by Drs. Dahlgren and Byers in determining whether they established general causation. Now the court doesn't have to address this differential diagnosis argument on the merits because the plaintiffs waived it below. They failed to discuss it before the court on the motions to exclude. And the trial court can't abuse its discretion on an argument that's not raised in the motion to exclude before. Well it was thoroughly aired on the motion for summary judgment, was it not? Well in the motion for summary judgment, that was the first time that the plaintiffs raised it. They raised it in their response and they raised it in the introduction, in passing. It was never developed in the briefing after that. And you spent a lot of time on it in your brief, right? In the summary judgment briefing? Right. Yes, we did. And the district court addressed it. So I guess, you know, it's in that category of claims that got a full airing in the district court even though it was raised at a later stage of the proceedings than perhaps it ought to have been. Your Honor, what I would submit is that they're claiming that the district court abused its discretion and not considering it on the motions to exclude. In terms of the motions to exclude and reaching its order, that argument was never raised. That's the argument that we actually first hear in an introduction in the summary judgment response and hear it developed for the first time here. Now on the merits, courts almost universally hold, as you noted, that a differential diagnosis is relevant to a general causation only. I mean, is irrelevant to a general causation analysis. It's relevant only to the specific causation analysis. And that's because you have to rule in vinyl chloride or any other chemical in the specific causation analysis and in the differential diagnosis analysis. Well actually, isn't there kind of a marked disagreement among the circuits on this point and among district courts and the evidence treatises? Your Honor, I would submit that any disagreement is very limited as, you know, you can discuss the sole case they cite on this issue in their brief. This case is like nothing like Turner or any of the other differential diagnosis case that says you can use it for general causation. What happened in Turner court is they suggested in dicta that a rigorous and comprehensive differential diagnosis could be used when there's a new toxic torque plaintiff and the medical literature has not been adequately developed. That's not the case we have here. We do not have a new toxic torque at issue and we don't have a lack of medical literature. There are hundreds of studies and in fact, as we point out, the toxicological profile for vinyl chloride contains 56 pages of reference to scientific studies regarding vinyl chloride. So there's volumes of use of differential diagnosis to assessment of specific causation. Yes, Your Honor. Sorry. Are you, so is it your position then that you can never use a differential diagnosis to establish general causation? I guess the point is there may be this limited instance such as Turner where you have, it's the where there's no evidence, there's no literature, you don't know anything about it. And so you have, you know, maybe you only have one study, you have no study. So you have to go to, for them to have, to be able to proceed, you have to find some other route to do that. What I'm saying is that's a rare instance and it's nothing like what we have here. It's a completely different case where you have volumes of evidence, you have these thresholds that have been developed by available to them. Here is the ability to take these studies, take this information and extrapolate, perform the quantitative analysis and show that these high dose, high duration, long duration studies were applicable to what they have here. Which were in adults or animals and not, I mean, you will never find studies or rarely find studies that deal with children and certainly deal with children in that very early stage of life where, you know, you would agree, right, that your cells are rapidly changing and the children at that particular age would be much more susceptible. Well, Your Honor, two points on that. First of all, there is a study that was similar. We talked about it in our brief. That's Myrtle Grove. It's a trailer park instance where they had very similar levels, a longer duration, four years versus less than two here. And the ATSDR went in, investigated and they found no health effects and no evidence that there could be any health effects. So that's one instance. I'm forgetting the other point there, Your Honor. Well, the other point, I guess, would be that, you know, you're also very, it would be difficult to find studies that involve children at that particular age. Right. My other point, Your Honor, on that is that you can do this quantitative analysis to make it so it fits with the children's exposure. There's methods to do that. The other thing is when the EPA develops these health-based thresholds, they factor in children, elderly, infirm. So they put in these safety factors and what you'll find is that when you look at these regulatory thresholds for analysis of health effects, the children's doses were either at or below any of these doses and these doses where they've determined no adverse effect or a lifetime of exposure. And what we're talking here is a very short duration. So the possibility of any health effects for these children. Thank you. Thank you, counsel. How much time? I won't use it all. Everybody calls me brief. It's funny that we talk about regulatory standards. Two is what these people should have been drinking. Two. They got 8.4. Now we understand that just simply showing that they drank 8.4 over two doesn't do it. But if we're talking about standards, they should have been drinking two. When people are looking at what's an acceptable standard, they want two. I agree, Your Honor. There is an issue over this differential diagnosis. And as I've looked at Meyer, this court, I don't see an analysis of this. And I was just rereading it there. I reread it last night. I don't see analysis of as they went through with Meyer figuring out was it general or was it specific. I mean, I do think that there is a question here as to whether the differential diagnosis can show the general as specific. But the other part of this is, and I think it gets to what Your Honor was talking about, even Maltoni, as one of his conclusions, and I'd read the whole thing but there's so much to do, but just immediately. Newborn animals appear to be extremely responsive and easily develop liver tumors, both in terms I can't say. So I mean, he knew right off. The younger they are, the worse it is. But as I look, trying to about how courts across this nation have dealt with this, and candidly, when you look at them, they're divergent. It's hard to get them to make sense of. I haven't found a case where an expert's excluded, where we have young children, not an adult, because adults can smoke and drink and have all sorts of other stuff, young children exposed to a known carcinogen, knowing that they had symptoms that related to that exposure, that the parents and treating physicians struggled to figure out the problem. And then a toxicologist, relying upon the literature, says, you know, if you drink 10 times higher than that, and the Maltoni point is, there are charts that say at 0.03 tumors are greater. Yes, the court pulled out, Mr. Chambers pulled out a quote where it said, VC-specific related tumors aren't related. It does say that, but the charts that Jill Powders is relying upon show overall tumors, there is an increased incident at 0.03. I haven't found one where those experts have been excluded. Thank you. Thank you. Thanks to both counsel. The case is taken under advisement.